## HOUGH v. GRANTS PASS POWER CO.

[69 Pac. 655.]

PLEADING NEGLIGENCE OF MASTER.

1. A complaint stating that deceased, who was a lineman and repairer for an electric power company, was, by direction of the manager, working on certain dead wires that needed immediate attention; that it was the duty of the manager to avoid exposing deceased to any unnecessary danger, and to warn him of dangers that might result from a failure of the defendant company to perform its duty; that while deceased was so at work the manager neglected to give any notice at the power house to keep the power off until deceased should be safely out of the way, and failed to warn deceased of danger which was or should have been known to said manager; that in consequence of such neglect the electric current was turned onto the wires on which deceased was working, whereby deceased was killed, alleges the manager's knowledge of the danger, and justified proof that the manager did know the risk.

NEGLIGENCE OF MASTER—ALLEGING IGNORANCE OF DECEASED.

2. A specific allegation that deceased did not know of the danger was unnecessary, for deceased was working on dead wires, which presumably would not be made live wires without notice.

ELECTRIC LIGHT POLE AS DANGEROUS PLACE TO WORK.

3. A pole carrying electric light wires is not necessarily a dangerous place to work, with reference to the currents, that will depend upon the care exercised at the controller; and it need not be alleged that the workman did not know the place to be dangerous, for it was not so except by the employer's carelessness.

ALLEGING DUTY TO GIVE WARNING.

4. The complaint was not objectionable because failing to specifically state that it was customary to give notice at the power house that workmen were still employed on the line, it being apparent from the whole complaint that failure to give notice in the customary way was the negligence charged.

SUFFICIENCY OF COMPLAINT—GENERAL DEMURRER.

5. Where a complaint in a personal injury action alleges negligence on more than one ground, it is good against a general demurrer if one of such grounds is sufficiently stated, though another is not.

DELEGATION OF DUTY BY MASTER.

6. Where a duty is imposed by law on a master with reference to his employes, it cannot be avoided by merely directing another employe to do it; of which rule this case affords an example: An electric lineman was working on dead electric light wires, under the immediate personal supervision of the light company's manager, just before time to start the dynamos in the evening. The manager directed another workman, having a bicycle, to ride past the power house and notify the employes there not to start the current till further notice. This employe negligently failed to reach the power house in time. *Held*, that the duty to give such notice was one personal to the master, and was not discharged by directing the workman to give it, unless he diligently performed his duty.

DUTY OF MASTER TO INFORM SERVANT OF SUDDEN DANGER.

7. It is the duty of a master to inform his servant of any sudden danger of which he has knowledge or should be informed, but of which the servant is ignorant, and the employe may rely on the warning and signals usually given in the conduct of the business, and, if the master fails to give these, he is negligent.

PLEADING AND PROOF—NEGLIGENCE.

8. Under a complaint alleging that plaintiff's injuries were caused by the negligent failure to notify defendant's servants at its power house not to turn on the current while plaintiff was working on the electric wires, evidence that it was customary to use a telephone to give such notification, instead of sending a messenger, as defendant did, was admissible; and the testimony as to such custom was not too remote in point of time, because relating to the year previous to the accident.

SHOWING COMPETENCY OF EXPERT BY CROSS-EXAMINATION.

9. Where the competency of an expert witness was not shown at the time he testified in chief, but was made fully apparent on cross-examination, admission of his testimony was not error.

EVIDENCE OF PREJUDICE OF THE JURY.

10. In a personal injury action against a corporation, the jury returned to the court room after the case was submitted to them, and stated that they understood that some time ago the "old company sold its interest to the new company," and they desired to know which of them would be responsible. The court stated that there was no evidence of any other company than the present defendant, and that the court knew of no other. The defendant was in fact what the jury referred to as the "new company," and was composed of nonresidents, while the former company was a local concern. *Held*, that the verdict could not be set aside on the ground that the personnel of defendant influenced the jury.

From Josephine: HIERO K. HANNA, Judge.

This is an action by A. C. Hough, as administrator of the estate of E. L. Moon, deceased, against the Grants Pass New Water, Light & Power Co., to recover for injuries received while acting in the capacity of a lineman in the employ of the defendant. The complaint, so far as it is of material import here, alleges "that the death of said Enoch L. Moon occurred and was caused by the neglect and wrongful acts and omissions of the defendant corporation, acting by and through its secretary and general manager, George I. Brown, in this: That the said Enoch L. Moon at the time of his death, on said October 2, 1899, and for some time prior thereto, was and had been an employe of said corporation, working on its electric system at Grants Pass, Oregon, as a lineman, and as such lineman it was his duty, under the instructions and directions of the said George I. Brown as general manager aforesaid, to ascend the electric light poles, and do all things needful for the keeping of the said line and electric light wires and apparatus in repair; and it thereby became the duty of said corporation, through its said secretary and general manager, to provide for said deceased safe and suitable appliances and places with and in which to work, and to avoid exposing said deceased to unnecessary danger, and to warn him of such dangers as to him were unknown, or to which any act or failure of duty of the said corporation should expose said deceased, and to this end to use and exercise due care, commensurate with the known danger, to protect said deceased from injury; that on said 2d day of October the said deceased, with the knowledge of said George I. Brown, acting

as manager aforesaid, and pursuant to his directions, and while under his control, was working on said line, doing necessary work on the electric light wires at or near the top of one of the electric light poles near the corner of Front and Fifth streets, which work was necessary to be completed before the said line was in condition for safe and proper use in lighting said town the night of said day; that on said date, while the deceased was performing said work and labor pursuant to the directions and by the authority aforesaid, the defendant, by its general manager aforesaid, wrongfully and negligently, and in violation of its duties and obligations to deceased, carelessly, negligently, and without due care on its part, by failing to take the ordinary, usual, and reasonable precautions, usual and customary in the conduct of its business, neglected and failed to give ordinary, usual, or timely notice to the defendant's employes at its power house that deceased was still working on the line aforesaid, and so prevent the electric current from being turned on said wires, and did carelessly and negligently fail to warn deceased of his danger, as was or should have been known to the said George I. Brown; and thereupon and in consequence of said negligence the dynamo or dynamos at the power house of said defendant were put in motion, whereby a powerful electric current was generated along and over said wires on which deceased was working, whereby and wherefrom said deceased received an electric shock, which caused him to be thrown from said pole a distance of about thirty feet, to the ground, and which caused his death; that defendant negligently failed and neglected to furnish and supply deceased with insulated nippers or rubber gloves with which to handle said wires in the course of his said employment; that the shock received by deceased and his subsequent death were caused by the wrongful acts, omissions, and negligence of the defendant corporation, through its manager, George I. Brown, neglecting to furnish deceased with insulated nippers and rubber gloves with which to handle said wires, and in not taking ordinary or reasonable care or means to prevent said electric current from being generated and turned upon said wires when deceased was working at said

time there as aforesaid, and in failing to warn deceased that there was likelihood or danger of said electric current being turned on, or that at said time and place it was unsafe to continue work, and in failing to take reasonable or ordinary precautions to notify defendant's employes at the power house that deceased was working on said wires, and so prevent said current from being turned thereon, and in failing to furnish deceased with rubber gloves and insulated nippers with which to handle said wires." A general demurrer to this complaint having been overruled, a trial was had, resulting in a judgment for plaintiff, and the defendant appeals.                              AFFIRMED.

For appellant there was a brief over the names of *William Torbert Muir* and *Austin S. Hammond,* with an oral argument by *Mr. Muir.*

For respondent there was a brief over the names of *A. C. Hough* and *H. D. Norton,* with an oral argument by *Mr. Hough, in pro. per.*

MR. JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

1. The first question presented is whether the complaint states facts sufficient to constitute a cause of action, which must be considered in view of the verdict in favor of plaintiff. The specific objection urged is that it is nowhere alleged that Brown, the manager of the defendant company, knew of the danger to which the deceased was exposed, or that deceased was ignorant thereof, or even that there was any danger attending the specific work in which he was engaged. Among other things, it is alleged that it was the duty of Brown to avoid exposing the deceased to unnecessary danger, and to warn him of such dangers, or to which any act or failure of duty on the part of the defendant would expose him; that the deceased, with the knowledge of Brown, and pursuant to his direction, was working on said line, which work was necessary to be completed before the same was in a safe and proper condition to use in lighting the

town the night of said day, and while deceased was so at work the defendant neglected and failed to give the ordinary or timely notice to its employes at its power house that the deceased was still working on the line, and so prevent the electric current from being turned on, and did carelessly and negligently fail to warn the deceased of his danger, which was or should have been known to Brown, in consequence whereof the current was turned on, and the injury ensued. This condensed statement of the contents of the complaint almost answers the objection, without further comment. It is alleged that Brown did know or should have known of the danger attending this condition, which allegation is amply sufficient to charge him with such knowledge, and to let in proof to that purpose.

2. It was not necessary for plaintiff to allege that the deceased was without knowledge of his danger, because he was directed to work upon dead wires, and presumably they would not be rendered dangerous without due notice and warning to him.

3. The danger was one not incident to the place in which he assented to work, but resulted directly and immediately from the negligent act of the employer in permitting to be transmitted over the wires a deadly current of electricity, thus rendering the work that was before perfectly safe extremely perilous and hazardous to life. Speaking generally, the vocation of a lineman may be classed as hazardous, but in this instance neither the immediate work in hand, nor the place in which it was performed, was hazardous or dangerous, and it was the duty of the defendant to take proper and reasonable precautions to guard against converting his position of safety into one of peril. It was therefore unnecessary for the pleader to go further than to allege the duty, and the neglect thereof which directly conduced to the danger, and consequently to the injury of the deceased. It would be an idle ceremony to require plaintiff to allege that deceased was without knowledge that his position was perilous by reason of his employer's liability to turn on the electricity, which the duty of the latter required he should not do unless he gave notice or warning thereof: *Carlson* v. *Oregon S. L. Ry. Co.* 21 Or. 450, 454, 455 (28 Pac. 497); *Promer* v.

*Milwaukee L. S. & W. Ry. Co.* 90 Wis. 215 (63 N. W. 90, 48
Am. St. Rep. 905). He assumed no risk of that kind by assent-
ing to do the work, whether it was with or without such knowl-
edge. A person must so use his property as not to wantonly in-
jure another, and a servant legally assumes no more danger or
risk by working for a reckless employer than he does for a careful
one. It is only when he enters a place of peril, obviously so, or
knowing it to be such, that he assumes the risk incident thereto.

4. It is contended that the complaint is faulty because it
contains no allegation that there existed any custom of the
company to give notice at the power house that persons were
still working on the line, or anything of equivalent nature. The
complaint was evidently drafted with the purpose of establishing
negligence by showing a failure to give such notice in the ordi-
nary and usual way, thus implying that there existed a custom-
ary mode or manner by which it was transmitted to or imparted
at the power house. It contains, also, a general allegation that
the negligence consisted in not taking ordinary or reasonable
care or means to prevent said electric current from being gen-
erated and turned on said wires when deceased was working
among them, etc. It might have been better, as a technical
pleading, to set out the customary manner of giving the notice
and its nonobservance; but we are of the opinion that the
complaint is sufficient when construed as a whole, especially
after verdict.

5. There is another criticism relative to the allegation that
defendant was negligent in failing to furnish deceased with
insulated nippers or rubber gloves, because not coupled with an
allegation showing the necessity of providing such appliances;
but, as the complaint is found to be sufficient in the statement
of negligence in one respect, it is good, as against a general
demurrer, even if deficient in the statement of another instance
of want of care.

6. A day or two before the injury occurred, a fire damaged
the lighting system of the defendant to such an extent that it
was necessary to repair it before further general use could be
made of it. The power house where the electricity was generated

is situated about a mile distant from the office, but was con-
nected therewith by a telephone. On the evening of October 2,
1899, the deceased ascended a pole for the purpose of tying four
primary wires that had been drawn across the upper of the two
cross arms attached to the pole, and thus completing the work
of repairing the system and making it ready for use again.
While so working he was heard to call out, and seen to be hanging
for an instant by his legs and arms on the cross arms, and then
to fall to the ground, a distance of thirty feet; and, when ap-
proached, life was extinct. W. L. Ireland testified that the de-
ceased ascended a pole at the junction of Front and Fifth streets
between fifteen and twenty minutes prior to six o'clock P. M.,
that two or three minutes later he ascended the pole from which
he fell, and that he noticed that the electric lights were on
immediately afterwards. Moorlock stated that the accident
occurred "pretty near quitting time." George I. Brown, who
was secretary and manager of the defendant company, testified
that while the deceased was on the pole at the corner of Front
and Fifth streets, and while standing within thirty-five or forty
feet thereof, he directed Haskins, who was riding a bicycle, and
was sixty-five feet or more distant from him, to go by the power
house and tell Gentner, who was attending the dynamo, "not
to turn the current on," and that this was close to an hour
before the accident occurred; that witness subsequently went to
the opera house, passing within fifty or sixty feet of the central
office of the telephone company; that he had telephone connec-
tion with the power house, but that he thought the line was not
in good working condition that evening. Haskins was in the
employ of the defendant, and at the time was working on a
dam, the location of which, with reference to the power house,
does not appear. He needed some nails for his work, which
Brown authorized him to obtain, and went to the Jewell Hard-
ware Co.'s store for them. That he reached the store about
half an hour before the accident; that he was there twelve or
thirteen minutes, and then started away, and that about fifteen
or twenty minutes afterwards the accident was reported at the
store. Gentner testified that he was attending the dynamo, and

had charge of the power house; that he turned on the current four or five minutes before Haskins arrived; that Haskins told him of Brown's directions, and that he turned it off at once; that the time was a quarter of six or seven o'clock; and that the telephone was in good working order in the evening. It was further shown that the primary wires carried 2,200 volts, and that it required two or three minutes after the dynamo was set in motion to get a full current through them; also that it was customary, after telephone connection had been made with the power house, to notify the person in charge by that means when workmen were on the lines, and, if there was any rush work to be done before the lights could be turned on, it was the usual custom to notify the linemen, and if they were not notified they generally ceased work about six o'clock, or whenever it got too dark to see.

At the close of plaintiff's testimony a motion for a nonsuit was made and overruled, and, after all the testimony had been submitted, the court, among other things, gave the jury these instructions:.

"If you find from the evidence that the deceased at the time was working on the electric light wires of the defendant with its knowledge or by its directions, and was killed by an electric current turned upon said wires by the defendant while he (deceased) was working upon them, and that the defendant, by using the ordinary and usual means of communication with its power house, viz., the telephone, could have prevented the electric current from being turned upon and over said wires at that time, but the defendant chose some other, less direct and more uncertain, mode of communicating with the power house, and that by reason thereof the said communication was not received at said power house until after the said current was turned on said wires on which the deceased was working, and that deceased received said current, and was killed by the shock therefrom, such finding would warrant you in further finding that the defendant was negligent. You may consider all these matters in determining whether or not the defendant was guilty of negligence at the time referred to.

"Where the negligence of the master is combined with the negligence of a fellow servant in producing the injury, which would not have happened but for the negligence of the master, and the person injured is himself free from negligence, the negligence of the fellow servant will not relieve the master from liability for the injuries so received.

"If a servant is charged with the performance of one of the master's duties, then the master must answer for his negligence in the discharge of that duty; and, if the servant whose negligence caused the injury was at the time performing one of the master's personal duties to his servants, the master is liable."

One reason urged why the nonsuit should have been granted is that plaintiff alleged that the defendant was negligent in not furnishing the deceased with rubber gloves or insulated nippers, and having failed to offer any proof to sustain the allegation, except that a pair of uninsulated nippers was found across one of the wires after the accident, he had not made a case sufficient to go to the jury. The manifest answer to this is that he was not required to rely upon this particular cause of negligence assigned, if he had another upon which he could depend for recovery. This matter was commingled in the complaint with other allegations of fact, which, if well founded, were sufficient without it to support the action.

The other question presented, both by the motion for a nonsuit and by the instructions, is one of more difficulty. Tersely stated, it is whether Brown discharged his duty to the deceased, as an employe of the company, by directing Haskins to go by the power house and notify Gentner not to turn on the electricity until 'further notified, and thereby relieved the company from liability for the injury sustained. The real situation is readily apparent. There was ample evidence from which the jury might have reasonably drawn the inference that Brown was exercising personal supervision of the work then being done. He was with the deceased shortly prior to the accident, supervising the work, and gave the directions to Haskins within his hearing. The duty which Brown attempted to perform by such directions was one personal to the master. It devolved upon him, under the

attending circumstances and conditions, to notify the operator at the dynamo not to turn on the electricity, and thus to protect the lives of the company's employes. The duty could have been discharged if he had taken reasonable precautions, such as would ordinarily be adopted by a prudent and reasonable person having experience in such matters; but it was not discharged by the mere selection of an agent, with directions to give the notice, whether the agent was a competent and careful person or not. He was still responsible for any dereliction of duty on the part of the agent, because he was directed to discharge a part of the master's duties, and therefore became vice principal, and in no sense a fellow servant with the injured party. This is not a case for the application of any general rule for the guidance, direction, and admonition of employes, but is one of special emergency. The lighting system of the defendant was, by reason of the damages sustained by fire, out of repair, and the deceased, with others, had been put to work by the general manager with a view to a quick and complete readjustment sufficient for use on the night of the accident, or at least such is the legitimate inference to be drawn from the testimony; and the general manager was looking personally to the protection of his men, and was discharging a personal duty, and he could not relieve the company of liability by delegating it to another, unless that other also exercised reasonable care and precaution in the discharge of such duty: *Wheeler* v. *Wason Mfg. Co.* 135 Mass. 294; *Schroder* v. *Chicago & A. R. Co.,* 108 Mo. 322 (18 S. W. 1094, 18 L. R. A. 827) ; *Promer* v. *Milwaukee L. S. & W. Ry. Co.,* 90 Wis. 215 (63 N. W. 90, 48 Am. St. Rep. 905) ; *McCampbell* v. *Cunard S. S. Co.,* 69 Hun 131 (23 N. Y. Supp. 477) ; *Faulkner* v. *Mammoth Min. Co.,* (Utah) 66 Pac. 799 ; *Tedford* v. *Los Angeles Elec. Co.,* 134 Cal. 76 (66 Pac. 76, 54 L. R. A. 85) ; *Carleton Min. & Mill. Co.* v. *Ryan,* 68 Pac. 279.

This is the theory, no doubt, upon which the first and third instructions before stated were given, and there was ample evidence adduced upon which to submit the case to the jury in that light. There was a conflict in the testimony as to the time the direction was given Haskins with reference to the time of the

injury, and it was for the jury to say whether timely precaution had been taken to get notice to the tender at the dynamo by such means before he would ordinarily turn on the electricity. And again, it was for the jury to say whether Haskins, acting in the capacity of vice principal, used reasonable diligence and precaution in reaching the power house in time to impart the instruction. So, also, it was for them to say whether a reasonable and prudent person would not have made use of the telephone, under the exigencies then existing, rather than to have given the directions through Haskins. A further objection is made to the instructions because it is assumed thereby that the ordinary and usual means of communicating with the power house was by telephone. There is evidence in the case that the telephone was in good working order at that time. Indeed, Brown himself admits as much, but seeks to excuse his omission to use it by want of knowledge as to its condition; but it is not disputed that, when in working order, such was the ordinary and usual means of communicating with the power house. These instructions were therefore suitable to the facts adduced, and properly given. In other respects the evidence was ample to carry the case to the jury, and the nonsuit was properly overruled. The second instruction, although good law in the abstract, was not applicable to the case, but was harmless, as the defendant was responsible for the negligent acts of Haskins, at any rate.

7. There was another instruction given which is complained of, by which the jury were told, in effect, that it is the duty of the master to inform the servant of any sudden danger of which he has knowledge or should be informed, but of which the servant is ignorant, and that the employe might rely on the warning and signals usually given in the conduct of the business, and, if the master fails to give these, he is negligent. This was given apparently in view of the testimony that it was usual to notify the linemen when any rush work was to be done before the lights were turned on. This duty was also personal to the master, and he was charged with the exercise of reasonable foresight and precaution to see that intelligence of such danger was conveyed to the workmen, and an omission to give the usual

warnings and signals previously employed in the conduct of the business under like circumstances would be negligence on the part of the master. The giving of this instruction was not error.

8. There was an exception to the testimony of young Moon, showing that, in the year previous to the accident, Brown customarily used the telephone in notifying parties in charge of the power house when employes were at work upon the lines, or else 'he went in person. The objection is based upon the idea that no such custom was pleaded, and that the testimony was too remote in point of time to show that it was still customary at the time of the accident for Brown to notify the power house by telephone in such an emergency. The allegations of the complaint were broad enough to admit the evidence, as well as to support the verdict, and the time fixed by the witness when the custom was in vogue was not so remote as to destroy any tendency of the evidence to show that it continued to exist.

9. Another objection is also urged to the testimony of Dr. Moore in reply to some hypothetical questions put to him as an expert, upon the ground that he was not shown to be qualified to testify in that capacity. Without discussing the matter at large, suffice it to say that, if such qualification was not sufficiently shown when the questions were propounded, the cross-examination of the witness relieved the case of any complication on that account, as his competency to testify as an expert in the premises was fairly disclosed thereby, and the objection is therefore not well taken.

10. There was a motion to set aside the verdict and for a new trial, based upon the circumstance that the jury, after being instructed and having the case submitted to them, returned to the court room and inquired which would be responsible, the old or the new company, if they should find negligence, and were answered that the court knew of but one company,—the defendant's. The jury again inquired, saying: "You know that some time ago the old company sold its interest to the new company, and we desire to know who would be responsible,—the old or the new." The court again answered, saying: "There is no

evidence of any other than the present,—the defendant." The jury thereupon again retired, and, after further deliberation, returned with their verdict. The appellant draws an inference from this circumstance that the jury found against the present company because its members were residents of Portland, and that if they had resided in Grants Pass the verdict would have been otherwise; and, based thereon, counsel insists that it should be set aside. What the jury's motives were in making the inquiry does not further appear, but the court properly told them that there was but one defendant liable in the premises, namely, the one before the court, and the inference suggested is so remote and inconsequential that it could hardly be imputed to a jury acting under the sanction of an oath.

Having disposed of all the matters in controversy, and being favorable to respondent, the judgment is affirmed.

AFFIRMED.

Decided 14 July, 1902; rehearing denied.